UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| MICHAEL J. CURRAN,<br><br>Plaintiff,<br><br>vs.<br><br>DAVID L. BERNHARDT, Secretary, U.S.<br>Department of the Interior<br><br>Defendant. | 5:20-CV-05009-LLP<br><br><br>MEMORANDUM OPINION AND ORDER |

Plaintiff, Michael J. Curran ("Plaintiff" or "Curran"), has filed a Complaint alleging that Defendant, David L. Bernhardt ("Defendant or "Bernhardt"), discriminated against him based on his race (Caucasian), sex (Male), and national origin (American) in violation of Title VII of the Civil Rights Act of 1964 and the Civil Rights Act of 1991, 42 U.S.C. § 1981a.   He claims that he was subjected to a hostile work environment during his employment with the Department of the Interior (Office of Appraisal Services) ("the Agency"), and that he was wrongfully removed from his Supervisory position on account of his race, sex and national origin.   He asks for compensatory and punitive damages.   Defendant has moved for summary judgment on all of Plaintiff's claims. (Doc. 61.)   For the reasons stated in this memorandum opinion, the motion for summary judgment is granted in part and denied in part.

**FACTUAL BACKGROUND**

During his one-year probationary period with the Agency from November of 2014 to November of 2015, Plaintiff was supervised by Ms. Lewis, Native American, from January 2015 to June 2015.   In October 2015, Ms. Lewis gave Plaintiff a rating of "minimally successful."   He appealed Ms. Lewis's rating, and his second-level supervisor adjusted the rating to an overall "fully successful" assessment in mid-December 2015.   Plaintiff's supervisor from approximately September 2015 to December 2015 was Mr. Bottemiller, a Caucasian, American male.   In October 2015,

Mr. Bottemiller demoted Plaintiff to the position of Review Appraiser. There were no open positions for Review Appraiser in the Great Plains Region, and Plaintiff was reassigned to another region of the Agency in Phoenix, AZ.

The following facts are taken from Defendant's Statement of Undisputed Material Facts. (Doc. 63.) The facts disputed by Plaintiff are noted.

The Office of Appraisal Services ("OAS") for the Office of the Special Trustee for Native Americans ("OST") is tasked with providing land appraisal services to Native American landholders. The Office of Appraisal Services is divided into various regions. The Great Plains Region's main office is located in South Dakota. The Regional Offices were managed by the Immediate Office, which was located in Albuquerque, New Mexico but is now in Denver, Colorado. Each of the Regional Offices was led by a Regional Supervisory Appraiser ("RSA"), which are now called Regional Directors.

The Regional Supervisory Appraiser in the Great Plains Region is responsible for managing the staff in that office, which includes coordinating with the Immediate Office in Albuquerque to obtain adequate resources in order to facilitate the functions of the Great Plains Region, primarily to ensure that appraisals are accomplished in a timely fashion. The Great Plains Region handles a large volume of appraisal requests received from Native American reservations in the region. As of November 2014, there was a backlog of appraisal requests in the Region.

The Office of Appraisal Services used a database called OASIS to track land appraisal requests received from Native American entities.

Plaintiff is a Caucasian, American male. Plaintiff served as the Regional Supervisory Appraiser for the Great Plains Region from November 2014 through November 2015. In this capacity, Plaintiff supervised three employees: Wanda Haller, Katherine Filesteel-LeBeau, and David "Jay" Widdoss. From November 2014 through November 2015, Plaintiff was subject to a probationary supervisory period.

Deborah Lewis is a Native American female. Ms. Lewis was Plaintiff's first-line supervisor from January 2015 through June of 2015 by virtue of being detailed to the Acting Deputy Director position of the Office of Appraisal Services. At all times relevant to this action, Ms. Lewis's duty station was in the Immediate Office located

in Albuquerque, New Mexico. After Ms. Lewis's detail terminated in June 2015, she became the backlog coordinator for the Great Plains Region.[1]

Eldred Lesansee is a Native American male. Mr. Lesansee was Plaintiff's second-line supervisor from January 2015 through December of 2015 by virtue of being the Director of the Office of Appraisal Services. In March 2015, Plaintiff sent an email to Mr. Lesansee and copied the Department of Interior's Ombudsman, Brian Bloch. In the email, Plaintiff complained about Ms. Lewis's management of himself and his staff. Defendant asserts that Mr. Lesansee sent Mr. Bloch to the Great Plains Region to address Plaintiff's concern, but Plaintiff contends that Mr. Bloch never appeared at the Great Plains Region to address his concerns. Rather, Plaintiff communicated his concerns to Mr. Bloch via telephone. (Doc. 69, p. 1, ¶ 2.)

Steven Bottemiller is a Caucasian, American male. Mr. Bottemiller became the Deputy Director of the Office of Appraisal Services on August 22, 2015, and served as Plaintiff's first-line Supervisor from August 22, 2015, through December 2015.

Defendant asserts that, on or about September 2015, Mr. Lesansee and Plaintiff had a verbal confrontation on a conference call. Plaintiff contends that Mr. Lesansee accused Plaintiff of things that were not true which were reported to Mr. Lesansee by Ms. Lewis, and Plaintiff expressed frustration at the accusations which he perceived as an assault to his reputation and ethical standards. (Doc. 69, p. 2, ¶ 3.) The conference call included at least one other witness.

Defendant asserts that, under Plaintiff's supervision, the Great Plains Regional Office's backlog of appraisal requests did not improve during the period November 2014-November 2015. Plaintiff contends that the Great Plains Region, Rapid City, SD FY2015 Monthly/Quarterly Report shows a decrease in the backlog starting in January 2015, with a significant decrease in the backlog in April 2015 and continuing through May 2015. (Doc. 69, p. 2, ¶ 4.)

At all times relevant to the Complaint, the Office of the Special Trustee's performance appraisal system consisted of five ratings: Exceptional, Superior, Fully Successful, Minimally Successful, and Unsatisfactory. In October 2015, Ms. Lewis

---

[1] Plaintiff notes that Ms. Lewis began back-log coordinator duties as early as March 2015 when she visited Great Plains to discuss back-log issues. (Doc. 69, p. 1, ¶ 1.)

conducted Plaintiff's annual performance evaluation because at that time, she was the only individual who had supervised Plaintiff for more than 90 days during the rating period. Ms. Lewis gave Plaintiff a "Minimally Successful" overall rating.

Defendant asserts that, on October 26, 2015, Plaintiff requested a voluntary change to a lower grade. Plaintiff contends that he was directed by Mr. Bottemiller to sign this document, or he would be removed. (Doc. 69, p. 2, ¶ 5.)

On October 30, 2015, Mr. Bottemiller issued Plaintiff a notice of Unsatisfactory Completion of Supervisory Probationary Period, Change to Lower Grade. Defendant asserts that Mr. Bottemiller determined Plaintiff had failed his supervisory probationary period based on Plaintiff's insufficient management of incoming appraisal workload, insufficient management of appraisal backlog, and disrespectful conduct towards the Director of the Office of Appraisal Services, Eldred Lesansee. Plaintiff contends that Mr. Lesansee and Mr. John White, Native American, also had input into that decision. (Doc. 69, p. 2, ¶ 6.)

Plaintiff was notified that the demotion was effective November 1, 2015. Plaintiff was further notified that since no vacant Review Appraiser positions were available at his current duty station, he would be reassigned to a different duty station.

In November 2015, Plaintiff formally appealed his FY 2015 rating. Plaintiff's rating was upgraded to "fully successful" on December 15, 2015.

Defendant asserts that Plaintiff accepted a directed reassignment to Phoenix, Arizona, on December 24, 2015. Plaintiff contends that he did not "accept" the reassignment to Phoenix. Rather, Plaintiff was left with no choice after his request for reconsideration of the demotion was denied. (Doc. 69, p. 2, ¶ 7.)

James Green is a Caucasian, American male. Defendant asserts that, from December 2015 to August 2016, Mr. Green took over management, including supervisory duties, of the Great Plains Region. According to Defendant, during that time, Mr. Green was successful in reducing the backlog of appraisal requests in the Great Plains Region. Plaintiff contends that Mr. Green was assigned these duties beginning in September 2015 not December 2015. (Doc. 69, p. 2, ¶ 8.) Plaintiff also indicates that Mr. Green was successful in reducing the backlog of appraisals in the

Great Plains Region because Mr. Green had 28 staff members assisting him. (Doc. 69, p. 2-3, ¶ 9.)

From October 2015 to October 2016, Mr. Green was supervised by Mr. Lesansee. During this period, Mr. Green received an overall rating of Exceptional on his performance review.

The following facts are taken from Plaintiff's Additional Material Facts Not in Dispute. (Doc. 69, pp. 3-10.) Defendant disputed only a few of the facts in its Reply Brief, and the Court will note which facts Defendant disputes.

Plaintiff is a member of a protected class based on his race, sex, and national origin. In 2013, prior to Plaintiff starting in the Regional Supervisory Appraiser role, requests were made to fill Review Appraiser vacant positions in the Great Plains Region due to severe impact on the appraisal workload production. In November 2014, when the Plaintiff began as the Supervisory Review Appraiser, he inherited the existing backlog at the Great Plains Region. When the Plaintiff began as the Supervisory Review Appraiser there was only one Review Appraiser assigned to his team: David "Jay" Widdos.

On December 9, 2014, the Plaintiff requested additional staffing to assist in the execution of the "Great Plains Workload Plan" that he drafted to address the backlog in the region. On April 17, 2015, Mr. Lesansee sent an email regarding "Plans for Backlog Elimination" to address the Great Plains Region backlog which was a result of "high volume of workload and two vacant Review Appraiser positions." The Great Plains Region was fifth in production out of the 12 Regions. During the relevant time period, Eldred Lesansee, a Native American Male, was Plaintiff's second-line supervisor.

Ms. LeBeau, Native American, testified that Ms. Lewis did not acknowledge Plaintiff during their first meeting, gave brief answers to Plaintiff's questions, and did not look directly at Plaintiff. Ms. LeBeau testified that Ms. Lewis commented about Plaintiff, "I bet you know more about what's going on in Indian Country than he does." Ms. LeBeau further testified that the comment was "very racist." Ms. LeBeau also testified that she believed the comment was meant to gauge how she "felt about nonnatives coming into this, into our world and running offices like this."

5

Plaintiff asserts that when he informed Ms. Lewis he was from the South, "she asked if I wore Wranglers boots and drove a pickup truck" in an exaggerated southern dialect. Defendant contends that there is no support in the record for the allegation that Ms. Lewis used a "southern dialect." (Doc. 75, p. 8, n.1.)

When the Plaintiff began as the Supervisory Review Appraiser, the Great Plains Region was counting appraisals by multiple tracts in the OASIS database versus counting them one appraisal per request. On February 9, 2015, Ms. LeBeau emailed Ms. Cora Boone regarding the OASIS discrepancy and their caseload not being properly reflected. There was not a written policy in place at OAS specifying which method was correct until Mr. Lesansee sent a memo regarding the same on May 15, 2015.

On May 28, 2015, Ms. Lewis emailed Plaintiff advising how to correct the counting tract discrepancies. Mr. Lesansee agreed that due to this counting tract method discrepancy, the "consistent issues with the accuracy of workload reports being produced by the Great Plains Region," which Defendant relies on to show a legitimate, nondiscriminatory reason for Ms. Lewis actions, is easily explained as an accounting discrepancy due to countervailing methods of tracking appraisals, and not necessarily due to issues with the Plaintiff's performance.

Plaintiff informed Mr. Bottemiller that he was concerned with Ms. Lewis providing his annual performance evaluation due to the issues he had been dealing with under her supervision. On September 8, 2015, a month following Mr. Bottemiller becoming Plaintiff's first-line supervisor, Mr. Lesansee emailed Mr. Bottemiller confirming that Mr. Bottemiller would be obtaining Plaintiff's mid-year performance evaluation from Ms. Lewis and drafting a proposed personnel action to terminate Plaintiff. Prior to introducing this email to Mr. Lesansee at his deposition, he was asked, "On November 1, 2015, Mr. Curran was demoted from supervisory regional appraiser to review appraiser. Who made that decision?" His response was, "It would be the immediate supervisor, Mr. Bottemiller." When asked "did Mr. Bottemiller discuss that his reasoning for demoting Mr. Curran with you," his response was, "He worked with HR in making that determination." Again, when pressed on whether that was a yes or no, Mr. Lesansee said, "Not prior to the [sic] to the action." Finally, Mr. Lesansee admitted that he provided HR documentation

to facilitate the termination of the Plaintiff.  However, he still refused to admit he had a discussion with Mr. Bottemiller regarding terminating the Plaintiff prior to the action despite the cited email proving as much.

Mr. Bottemiller testified that prior to demoting Plaintiff, he discussed Plaintiff's performance with Ms. Lewis, but did not discuss Plaintiff's performance with Mr. Alex Glade, Plaintiff's most recent first-line supervisor. Mr. Glade, Plaintiff's supervisor for at least three months in 2015, testified that Ms. Lewis "treated Plaintiff disrespectfully"; that he reported to Mr. Lesansee that Plaintiff was "doing a very good job"; and that Ms. Lewis would incorrectly report to Mr. Lesansee that Plaintiff was not performing his duties. Defendant contends that Mr. Glade only served as Plaintiff's first-line supervisor from on or about July 2015 through August 22, 2015, and thus Plaintiff misrepresents Mr. Glade's supervisory duties in 2015. (Doc. 75, p. 8, n.2.)

The Great Plains Region did not hire additional full-time Review Appraisers until October of 2015, bringing the total number of Review Appraisers to three. Funding for outsourcing appraisal services was not approved by Mr. Lesansee until June 24, 2015.  Regions with a similar workload as the Great Plains Region had a minimum of four Regional Appraisers during the same timeframe.  The Plaintiff never had an opportunity to utilize the two newly-hired Review Appraisers to address the Great Plains Regions backlog prior to his demotion.

When posed with the question, "Isn't it safe to say that the reason for the backlog, that there wasn't enough man, manpower to do the work?" Ms. Lewis replied, "As I understood it." Ms. LeBeau testified that when an appraisal is accepted it has to be assigned to an appraiser, and that between January 2015 and November 2015, the untimely acceptance of appraisals was due to having only one staff appraiser. Ms. LeBeau testified that she worked closely with Plaintiff; that the tribal community expressed concern about his removal since they were finally seeing progress; and that she never witnessed discourteous or unprofessional behavior by Plaintiff.

Ms. Crystal Ross from the Winnebago Defendant wrote Plaintiff upon learning he was no longer at Great Plains and stated,

I feel really bad because you had things rolling from the get go. I know you shared with me some of the ideas to make that office run smooth so I was devastated to when I heard the news. You truly had the best interest of the Tribes in mind. I also wanted you to know that the Winnebago Defendant and me personally had nothing but good things to say about you and that we really liked working with you.

Ex. 19.

Mr. James Green was tasked with assisting with the appraisal back-log beginning in August 2015 and then tasked with taking over the position of Project Lead, prior to the Great Plains Region hiring additional full-time Review Appraisers in October of 2015. Mr. Green testified that Plaintiff was "effective" in reducing the backlog; that he "did not have a lot of tools to work with;" and that during the time Plaintiff was in the Supervisory position "there was a decrease in the back-log, it was headed in the right direction." Mr. Green also testified that the backlog was caused "primarily due to lack of personnel." Ms. Kim Klostermeier, Plaintiff's counterpart in the Mountain Region, testified that Plaintiff was "setup to fail"; "had no reliable staff to work with and was blamed for the large appraisal back-log and expected to eliminate it immediately;" and that Plaintiff did an "outstanding job in the time he was there."

Mr. Lesansee testified that during the alleged discourteous call Plaintiff became upset at questions being posed to him regarding delays in the backlog that were not only attributed to him but also to Ms. Lewis. Mr. Lesansee further admits that the progress reports that he was inquiring on were supposed to be provided jointly by Ms. Lewis and the Plaintiff.

On December 15, 2015, upon Plaintiff's request for reconsideration, his FY2015 Performance Appraisal was upgraded to "Fully Successful" by Mr. Harvey Gates. Upon receipt of the corrected "Fully Successful" rating, Plaintiff requested reconsideration of the demotion and reassignment. Mr. Bottemiller denied Plaintiff's request for reversal of the downgrade and reassignment, citing that he had discussed the request with Mr. Lesansee. Despite documented evidence to the contrary, Mr. Bottemiller testified that it was his decision alone to not reconsider Plaintiff's request for a reconsideration of the downgrade based on the corrected "Fully Successful" rating. On December 21, 2015, Mr. Bottemiller emailed Mr.

Lesansee and stated, "According to Kari Wier, the action of removing Mike from a supervision role was separate from his EPAP performance. The removal action can still stand if you and John White agree. Thoughts?" Mr. Lesansee emailed John White, Native American, requesting input on how to handle Plaintiff's request for reconsideration of his demotion due to receiving a "Fully Successful" rating.

Mr. Green had 28 staff members assisting in the elimination of the Great Plains Region backlog versus the 2 the Plaintiff had from January 2015 until September 2015 when Mr. Green took over these duties.

Plaintiff testified that Mr. Widdoss charged over $1,000 to the government charge card prior to Plaintiff's arrival at Great Plains. Mr. Widdoss incurred the $1,000 charge in October of 2014. Plaintiff arrived in Great Plains in November of 2014 and began to work on Mr. Widdos' improper charge issue in March 2015. No one had corrected the issue prior to Plaintiff's arrival, and he tried to clean it up once he arrived.

Ms. Lewis never supervised Mr. Green while he was the Great Plains Supervisory Review Appraiser. Defendant's Exhibit X doesn't specify the employees listed were changed to a lower grade and appears to only track employees that were placed back into their positions after completing a Temporary Promotion rather than changed to a lower grade after serving in a Supervisory probationary position.

On March 24, 2015, the Plaintiff sent an email to Mr. Lesansee and Ombudsman Bloch, detailing his experiences with Ms. Lewis. He even stated in the email, "[t]his situation has become untenable. I now feel as though I am being singled out, unfairly criticized, blamed for issues before my arrival, held to unattainable standards, being set up for failure and harassed. This has now become a hostile work environment and moral [sic] is getting pretty low here with every demand, negative comment and overall critical attitude toward the staff and me."

## PROCEDURAL BACKGROUND

According to the Complaint, Plaintiff has exhausted all of his administrative remedies. (Doc. 1, p. 3.) On February 26, 2016, Plaintiff timely filed a formal EEO Charge of Discrimination with the Equal Opportunity Employment Commission ("EEOC") for discrimination based on his race (Caucasian), sex (Male), national origin (American) and a hostile work environment for the adverse employment

actions alleged in this case.  On August 7, 2019, an Administrative Law Judge issued a Decision on the Agency's Motion for Summary Judgment, without a hearing, finding that Plaintiff failed to raise any genuine issues of material fact or issues of credibility relevant to the allegations of discrimination.  On August 14, 2019, the Agency issued a Final Agency Decision giving the Plaintiff 90 days to file a civil in federal district court.

On September 9, 2019, Plaintiff filed this action in the District of Columbia. In response to Defendant's Motion to Dismiss or, in the Alternative, to Transfer Venue, the D.C. Court transferred the case to the District of South Dakota.

In this lawsuit, Plaintiff alleges that his poor performance review was the result of a hostile work environment and discrimination by Ms. Lewis. Specifically, he alleges that Ms. Lewis created a hostile work environment during the period she supervised him, and then discriminated against him on the basis of race, sex, and national origin when she rated his yearly performance as "Minimally Successful." Moreover, Plaintiff contends that both Mr. Bottemiller and Plaintiff's second-line supervisor, Eldred Lesansee, a Native American male, discriminated against him on the bases of his race, sex, and national origin by directing Plaintiff's demotion and reassignment.  Defendant filed a motion for summary judgment, arguing that the undisputed facts show that Defendant did not subject Plaintiff to either a hostile work environment or disparate treatment with regard to any of the personnel actions taken against Plaintiff. According to Defendant, Plaintiff was demoted and reassigned based on his performance during his one-year probationary period, and thus Defendant is entitled to judgment as a matter of law.

Most of the documents submitted by the parties for purposes of the motion for summary judgment were extracted from the Report of Investigation compiled at the administrative level by Felicia Ross, a contract EEO investigator.

## PRINCIPLES OF SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment shall be entered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In ruling on a motion for summary judgment, the Court is required to view the facts in the light most favorable to the non-moving party and must give

that party the benefit of all reasonable inferences to be drawn from the underlying facts. *AgriStor Leasing v. Farrow*, 826 F.2d 732, 734 (8th Cir. 1987).  The moving party bears the burden of showing both the absence of a genuine issue of material fact and its entitlement to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).

Once the moving party has met its burden, the non-moving party may not rest on the allegations of its pleadings but must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists.  Fed. R. Civ. P. 56(c); *Anderson*, 477 U.S. at 257; *City of Mt. Pleasant v. Associated Elec. Coop., Inc.*, 838 F.2d 268, 273–74 (8th Cir. 1988).  Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.  "[T]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (internal quotation marks omitted).

## I. Title VII Discrimination

### A. The Law

Plaintiff alleges that Defendant discriminated against him based on his race, sex, and national origin in violation of Title VII.  Title VII of the Civil Rights Act of 1964, as amended, makes it unlawful for certain employers "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1).

The Eighth Circuit has described what courts are to consider when ruling on a motion for summary judgment in an employment discrimination lawsuit:

> At the summary judgment stage, the issue is whether the plaintiff has sufficient evidence that unlawful discrimination was *a* motivating factor in the defendant's adverse employment action. If so, the presence of additional legitimate motives will not entitle the defendant to

11

> summary judgment. Therefore, evidence of additional motives, and the
> question whether the presence of mixed motives defeats all or some
> part of plaintiff's claim, are trial issues, not summary judgment issues.

*Griffith v. City of Des Moines*, 387 F.3d 733, 735 (8th Cir. 2004) (emphasis in
original).

To defeat summary judgment on his discrimination claim, Plaintiff must
either show direct evidence of discriminatory motive or intent, or rely on the burden-
shifting method in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to create
an inference of discrimination. *Blake v. MJ Optical. Inc.*, 870 F.3d 820, 825–26 (8th
Cir. 2017).

Plaintiff frames his argument in terms of the *McDonnell Douglas* paradigm.
Under *McDonnell Douglas*, Plaintiff must first establish a prima facie case of
discrimination. *McDonnell Douglas*, 411 U.S. at 802. A prima facie case of
discrimination requires that Plaintiff show he: "(1) is a member of a protected group;
(2) was meeting the legitimate expectations of the employer; (3) suffered an adverse
employment action; and (4) suffered under circumstances permitting an inference
of discrimination." *Davis v. Jefferson Hosp. Ass'n*, 685 F.3d 675, 681 (8th Cir.
2012). In a reverse-racism case, the plaintiff must also show that "background
circumstances support the suspicion that the defendant is that unusual employer
who discriminates against the majority." *Hammer v. Ashcroft*, 383 F.3d 722, 724
(8th Cir. 2004). The Eighth Circuit has "recognize[d] that the threshold of proof
necessary to make a prima facie case is minimal." *Rose-Maston v. NME Hosps., Inc.*,
133 F.3d 1104, 1109–10 (8th Cir. 1998).

If Plaintiff establishes a prima facie case, the burden shifts to Defendant to
articulate a legitimate, non-discriminatory reason for its adverse employment
action. *See Davis*, 685 F.3d at 681.

If Defendant articulates a legitimate, nondiscriminatory reason, the burden
shifts to Plaintiff to show that the "proffered justification is merely a pretext for
discrimination." *Davis*, 685 F.3d at 681. "There are at least two ways a plaintiff may
demonstrate a material question of fact regarding pretext." *Torgerson v. City of
Rochester*, 643 F.3d 1031, 1047 (8th Cir. 2011). "A plaintiff may show that the
employer's explanation is unworthy of credence ... because it has no basis in fact.

Alternatively, a plaintiff may show pretext by persuading the court that a [prohibited] reason more likely motivated the employer." *Id.* (alterations in original) (citations omitted) (internal quotation marks omitted). Other ways a plaintiff may show pretext include "showing that an employer (1) failed to follow its own policies, (2) treated similarly-situated employees in a disparate manner, or (3) shifted its explanation of the employment decision." *Lake v. Yellow Transp., Inc.,* 596 F.3d 871, 874 (8th Cir. 2010).

### B.  ANALYSIS

#### Prima Facie Case

#### 1.  Member of Protected Group

Though Defendant argues that Plaintiff has failed to establish that Defendant is "the unusual employer who discriminates against the majority," Defendant does not dispute that Plaintiff is a member of a protected group.

#### 2.  Meeting Legitimate Expectations of Employer

Defendant argues that Plaintiff has presented no evidence that he met the primary responsibility of a Regional Supervisory Appraiser to "ensure that appraisals were accomplished in a timely fashion." According to Defendant, Plaintiff offers only excuses for why he was unable to meet this job expectation.

Everyone agrees the backlog had been plaguing the Great Plains region for years before Plaintiff's employment, and that Plaintiff did not have the staff necessary to address the backlog. An employer is not entitled to the services "of the ideal employee, but rather what the employer could legitimately expect." *Keathley v. Ameritech Corp.,* 187 F.3d 915, 920 (8th Cir.1999), *abrogated on other grounds by Torgerson,* 643 F.3d 1031. The record reveals that it was unrealistic for Defendant to expect Plaintiff to conquer the appraisal backlog in one year with only one appraiser on staff. Regions with a similar workload as the Great Plains Region had a minimum of four Regional Appraisers during the same timeframe. In December of 2014, Plaintiff requested additional staff to address the backlog in the Great Plains Region. Funding for outsourcing appraisal services was not approved until June 24, 2015. Two additional full-time appraisers were not hired until October of 2015. Plaintiff did not have a chance to address the backlog before he was demoted.

The Seventh Circuit has held that even a plaintiff's own testimony about the quality of his work is enough to establish the work-performance element of his prima facie case. *See Williams v. Williams Electronics, Inc.,* 856 F.2d 920, 923 n.6 (7th Cir. 1988) ("A determination that an individual is performing a job well enough to meet an employer's legitimate expectations, when made in the context of a prima facie case, may be based solely upon the employee's testimony concerning the quality of his work.") citing *Yarbrough v. Tower Oldsmobile, Inc.,* 789 F.2d 508, 512 (7th Cir. 1986)). Here, the record is replete with evidence of the good quality of Plaintiff's work from people who were in a position to judge his job performance with Defendant, including Ms. LeBeau, Mr. Glade, Mr. Green, Ms. Klostermeier, and Ms. Ross. That is enough to establish this second element of Plaintiff's prima facie case.

### 3. Suffered an Adverse Employment Action

Defendant argues that the "minimally successful" rating decision by Ms. Lewis did not constitute an adverse employment action. However, a reasonable person could infer that the performance evaluation and Ms. Lewis's opinions about Plaintiff were made available to Mr. Bottemiller and Mr. Lesansee, and that they played a role in the decision to demote Plaintiff. That, together with evidence of possible racial bias on Ms. Lewis's part (discussed below), is enough to get Plaintiff to a jury on his claim of race discrimination. There is no dispute that the demotion to a lower grade is an adverse employment action.

### 4. Circumstances Permitting an Inference of Discrimination

As an initial matter, the Court rejects Defendant's argument that Plaintiff must have comparative evidence in order to establish this element of a prima facie case of discrimination. Comparator evidence (a similarly situated employee outside the protected class who was treated differently) is one way of satisfying the fourth element of a prima facie case, but it is not the only means of establishing it. The Eighth Circuit has instructed:

> Comparative evidence is certainly not the "exclusive means by which a plaintiff may establish an inference of discrimination[,]" however. *Young,* 152 F.3d at 1022. Plaintiffs may satisfy the fourth element through other types of evidence. *See, e.g., Roberts v. Park Nicollet Health Servs.,* 528 F.3d 1123, 1127-29 (8th Cir. 2008); *Simmons v. New Pub. Sch. Dist. No. Eight,* 251 F.3d 1210, 1214 (8th Cir. 2001); *Landon v. Northwest Airlines, Inc.,* 72 F.3d 620, 624 (8th Cir. 1995); *see*

14

*also Putman v. Unity Health Sys.,* 348 F.3d 732, 736 (8th Cir. 2003) ("[E]vidence of pretext-normally considered only at step three of the *McDonnell Douglas* analysis-[can also] satisf[y] this aspect of the plaintiff's prima facie case burden."). Moreover, "remarks of the employer that reflect a discriminatory attitude" are often sufficiently strong evidence to avoid the *McDonnell Douglas* framework completely, as in the example of *Roberts,* 528 F.3d at 1128 (quotation omitted); *see also Griffith,* 387 F.3d at 736. The touchstone inquiry remains whether circumstances permit a reasonable inference of discrimination.

*Lewis v. Heartland Inns of Am., L.L.C.,* 591 F.3d 1033, 1040 (8th Cir. 2010).

Here, as allowed under Eighth Circuit precedent, Plaintiff relies on evidence of pretext in order to establish an inference of discrimination.

The most significant evidence in support of the race discrimination claim is the alleged statement of Ms. Lewis at her first meeting with Plaintiff and his assistant, Katherine LeBeau. According to Ms. LeBeau, the first time Ms. Lewis visited the Great Plains office in March of 2015, she would barely acknowledge Plaintiff and would give only brief answers to his questions. When Plaintiff left the conference room, Ms. Lewis asked Ms. LeBeau questions about Plaintiff and said, "I bet you understand more about Indian country than he does." Ms. LeBeau took this as a racist comment. A reasonable jury could make that same inference.

Plaintiff also alleges that, the day before the meeting at the Great Plains office, Ms. Lewis asked Plaintiff if he wore boots, Wranglers and drove a pick-up truck. A reasonable jury could infer that this was a reference to his race.

Though Defendant argues that Ms. Lewis is a generally disagreeable person who is difficult to get along with, Plaintiff described Ms. Lewis as singling him out, unfairly criticizing him, blaming him for issues that arose before his arrival on the job, holding him to unattainable standards, harassing him, and causing a hostile work environment. (Doc. 71-30, March 24, 2015 email from Plaintiff to Mr. Lesansee and Mr. Bloch.)

Perhaps Ms. Lewis had a personality conflict with Plaintiff, or perhaps it was discrimination. Which inference to draw, if any, is for the jury. A reasonable jury could find that Ms. Lewis's explanation for giving Plaintiff a "minimally successful" rating in his performance evaluation was pretextual, and that race was a motivating

factor in the evaluation, particularly in light of the subsequent up-grading of the performance evaluation to "fully successful" by Mr. Gates.

In addition to Ms. Lewis's words and actions, there are questions concerning the credibility of Mr. Bottemiller's explanation for Plaintiff's demotion. Although Bottemiller asserts that the negative performance evaluation by Ms. Lewis was not considered in the decision to demote Plaintiff, there is evidence to the contrary. Mr. Bottemiller admitted that Ms. Lewis told him in advance what she thought her performance ratings might be. An email from Mr. Lesansee to Mr. Bottemiller dated September 8, 2015 states, in part: "Just so we are on the same page, I have an understanding that you will be (1) obtaining documented mid-year performance evaluation for Michael Curran from Deborah Lewis and (2) write up the proposed personnel action to terminate Mr. Curran at probation." (Doc. 71-17.) Mr. Bottemiller testified that he had been Plaintiff's supervisor for only eleven days when the September 8 email was sent to him from Mr. Lesansee about terminating Plaintiff's employment based on documentation from Ms. Lewis. Mr. Bottemiller said he did not take immediate action because he "wanted to get the lay of the land" first. Getting the "lay of the land" included talking to Ms. Lewis and Mr. Lesansee, but it did not include any discussion with Plaintiff or his supervisor at that time, Mr. Glade, who said that Plaintiff was doing a very good job and that Ms. Lewis at times would incorrectly report that Plaintiff was not performing his duties. A factfinder may deem the conflicting evidence probative on the question whether Mr. Bottemiller's asserted reasons for the demotion were true, and whether Ms. Lewis had a say in Plaintiff's demotion.

Mr. Lesansee testified that it was Ms. Lewis's job to inform him of Plaintiff's performance. (Doc. 71-9, p. 6.) Accordingly, Ms. Lewis was in a position to substantially impact other decisionmakers regarding Plaintiff's employment. It is for the jury to make credibility findings and decide whether or not Plaintiff's proffered evidence of discrimination is to be believed, and whether Plaintiff's race played a motivating part in the adverse employment decisions at issue. Though Defendant contends that the adverse conduct claimed by Plaintiff was justified due to the backlog and his contentious call with Mr. Lesansee, this is only relevant to determining whether race was a motivating factor in the treatment of Plaintiff.

The record is clear that a backlog existed during Plaintiff's one-year period as the Appraisal Supervisor.   However, the record is also clear that the backlog was a persistent problem prior to Plaintiff's arrival.   Plaintiff only had one appraiser on staff.   He requested approval to hire additional appraisers for a region that lacked the necessary staff to handle the backlog.   Just one month before Plaintiff's demotion, two appraisers were hired.   That did not leave enough time to get the appraisers trained to help relieve the backlog, suggesting that the backlog was not the real reason for Plaintiff's demotion.   In fact, the record indicates that the subsequent supervisor who finally was able to conquer the backlog, Mr. Green, had 28 appraisers compared to the one appraiser under Plaintiff.   Even Ms. Lewis testified that the backlog was due to the lack of "manpower" to do the work.  (Doc.71-21, p. 2.)  And Mr. Lesansee testified that "the fact is that there was a lot of work, and the fact is that there – we did have some vacancies, and we were trying to fill them, but the government doesn't move as fast as - - as we would like it to be." (Doc. 71-9, p. 3.)

Further evidence that Defendant's reason for the demotion were pretextual include the record evidence that other supervisors and employees said Plaintiff's work performance was good.   In fact, Alex Glade, who supervised Plaintiff after Ms. Lewis, stated that Ms. Lewis "would report to Mr. Lesansee that [Plaintiff] was not performing his duties.   In most cases, she was incorrect." (Doc. 71-18, p.3.)  On this record, a factfinder could infer a discriminatory motive in Defendant's actions to demote Plaintiff.

Finally, a reasonable factfinder could disbelieve that Plaintiff was demoted for the alleged contentious conversation with Mr. Lesansee.   On summary judgment, the conversation must be construed in the light most favorable to Plaintiff.   Plaintiff admits he was frustrated and that it was a "spirited" discussion, but he described it as defending himself from unwarranted accusations being made by Mr. Lesansee.   Even Mr. Lesansee agreed that Plaintiff could have felt his integrity and character were being questioned by Mr. Lesansee during the conversation.   (Doc. 71-9, p. 6.) There is no showing that Plaintiff was reprimanded or disciplined in any fashion for the conversation.

17

On this record, a factfinder could infer a discriminatory motive by Defendant in demoting Plaintiff, thus meeting the fourth element of a prima facie case of discrimination.

For these same reasons, Plaintiff has met his prima facie showing that Defendant could be the unusual employer who discriminates against the majority.

### Legitimate Reasons and Pretext

Once a plaintiff establishes a prima facie case of discrimination, the employer must articulate a legitimate, nondiscriminatory reason for the adverse employment action. As explained above, the Court concludes that Defendant's expectation that Plaintiff would catch up on the backlog of appraisals was not a legitimate expectation.

Assuming for the sake of argument that Defendant had a legitimate, nondiscriminatory reason for the "minimally successful" rating and the demotion, the burden would shift to Plaintiff to show that the "proffered justification is merely a pretext for discrimination." For the same reasons that Plaintiff met the fourth prong of the prima facie case with evidence of pretext, Plaintiff has also met this last step of the *McDonnell Douglas* framework by showing that a genuine issue of fact exists regarding whether Defendant's legitimate nondiscriminatory reasons for his termination were pretextual. *See Griffith*, 387 F.3d at 735 ("At the summary judgment stage, the issue is whether the plaintiff has sufficient evidence that unlawful discrimination was *a* motivating factor in the defendant's adverse employment action.") (emphasis in original).

In summary, the Court concludes that the facts, viewed in the light most favorable to Plaintiff, demonstrate that there is a genuine dispute for trial concerning whether Defendant's adverse actions were motivated solely by Plaintiff's work performance, or whether Plaintiff's race was a motivating factor in the employment decision. Accordingly, Defendant's motion for summary judgment is denied as to the race discrimination claim in Count One of the Complaint.

There is no evidence, however, that any of the adverse employment actions were motivated by Plaintiff's gender or national origin. Accordingly, Plaintiff has failed to make a prima facie case of sex discrimination (Count Two), and national

origin discrimination (Count Three), and summary judgment will be granted to Defendant on those claims.

## II. Title VII Hostile Work Environment

### A. The Law

Plaintiff claims that he was subjected to a hostile work environment based on his race, sex and national origin. Title VII is violated "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citations omitted). To establish a prima facie case, a plaintiff must show: "(1) that they belong to a protected group; (2) that they were subject to unwelcome harassment; (3) a causal nexus between the harassment and their membership in the protected group; [and] (4) that the harassment affected a term, condition, or privilege of employment." *Dowd v. United Steelworkers of Am., Local No. 286*, 253 F.3d 1093, 1101 (8th Cir. 2001) (citation omitted).

In order to establish the fourth element, Plaintiff must show that the harassment was "sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment." *Clay v. Credit Bureau Enterprises, Inc.*, 754 F.3d 535, 540 (8th Cir. 2014) (quoting *Malone v. Ameren UE*, 646 F.3d 512, 517 (8th Cir. 2011)). The Eighth Circuit has explained that this element requires "a twofold inquiry." *Kratzer v. Rockwell Collins, Inc.*, 398 F.3d 1040, 1047 (8th Cir. 2005). "First, the harassment must be sufficiently severe or pervasive to create an 'objectively hostile' work environment . . . . Second, if the victim does not subjectively perceive the environment as abusive, then the conduct has not altered the conditions of employment." *Id.* (internal citations omitted). In other words, the conduct must be severe as viewed objectively by a reasonable person and subjectively by the alleged victim. *Singletary v. Missouri Dep't of Corrs.*, 423 F.3d 886, 892 (8th Cir. 2005) (citation omitted).

The Eighth Circuit has elaborated on the inquiry into whether or not the environment was "objectively hostile":

> [The environment] must be more than merely offensive, immature or unprofessional; it must be extreme. Conduct that does not exceed the

> threshold of severity is insufficient to create a prima facie case of sexual harassment. Title VII was not designed to create a federal remedy for all offensive language and conduct in the workplace.

*Kratzer*, 398 F.3d at 1047 (internal citations and quotations omitted). In other words,

> [H]arassment standards are demanding — to be actionable, conduct must be extreme and not merely rude or unpleasant. More than a few isolated incidents are required, and the alleged harassment must be so intimidating, offensive, or hostile that it poisoned the work environment. [The plaintiff] must prove his workplace was permeated with discriminatory intimidation, ridicule, and insult.

*LeGrand v. Area Res. for Cmty. and Human Servs.*, 394 F.3d 1098, 1101–02 (8th Cir. 2005) (internal citations and quotations omitted). The determination of whether or not an environment was "objectively hostile" is "a fact-intensive inquiry." *Moring v. Ark. Dep't of Corr.*, 243 F.3d 452, 456 (8th Cir. 2001) (citing *Bales v. Wal–Mart Stores, Inc.*, 143 F.3d 1103, 1109 (8th Cir. 1998)). To determine whether a work environment would be objectively offensive to a reasonable person, courts "examine all the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether the conduct unreasonably interfered with the employee's work performance." *Singletary*, 423 F.3d at 892.  A single offensive utterance or exposure to distasteful conduct ordinarily does not rise to the level of a Title VII violation. *See Hathaway v. Runyon*, 132 F.3d 1214, 1221 (8th Cir. 1997).

## B. Analysis

In support of his hostile work environment claim, Plaintiff cites to the numerous instances set forth in three pages of his affidavit that was prepared for the administrative proceedings that took place before this lawsuit was filed.  (Doc. 70-1, pp. 3-6.)  Rather than repeat all of the instances here, they are incorporated by this reference.  Plaintiff also refers to the comment Ms. Lewis allegedly made to Ms. LeBeau that, "I bet you know more about what's going on in Indian country than [Plaintiff] does," and the comment Ms. Lewis made directly to Plaintiff about wearing

boots and jeans and driving a pickup truck.[2]  He contends that the comments were discriminatory.

Defendant downplays the incidents, describing them as allegations that Ms. Lewis was "discourteous, unprofessional, contentious, and unpleasant toward him and his staff." (Doc. 62, p. 9.) Defendant argues that, even taken together, "these isolated instances cannot be seen as sufficiently severe or pervasive so as to constitute a hostile work environment." (*Id.*, p. 12.)

While no single instance that Plaintiff lists may be severe enough standing alone to deem his work environment hostile, Plaintiff is not complaining solely about sporadic and isolated events.   Rather, Plaintiff is referring to his daily working conditions beginning when Ms. Lewis became his supervisor. Plaintiff points to multiple times that he was subjected to conduct and comments by Ms. Lewis that could support a claim that her challenged conduct crossed the line from mere unpleasantness to harassment, and that the harassment was sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment.   For example, Ms. Lewis allegedly cut Plaintiff out of the process of finding additional staff to work on the overdue appraisal requests because she was supposedly coordinating everything. But the assistance supposedly coordinated by Ms. Lewis came too late to help Plaintiff with the workload, and it is not clear why there was such a delay.   It is clear, however, that the lack of staffing led to the appraisal backlog not being reduced, which in turn led to Plaintiff's demotion.

After careful consideration of the record, the Court concludes that an objective person who was experiencing what Plaintiff says he did could reasonably find that his work environment was hostile or abusive.  In addition, the fact that Plaintiff told Mr. Lesansee in March of 2015 that the work environment was hostile, and that he felt "singled out, unfairly criticized, blamed for issues before my arrival, held to unattainable standards, being set up for failure and harassed" by Ms. Lewis demonstrates that Plaintiff subjectively found that his work environment was offensive.

---

[2] The Eighth Circuit has recognized that discriminatory conduct a plaintiff hears about through other individuals is relevant to whether a hostile environment existed and whether the plaintiff perceived the conduct to be hostile or abusive. *See Carter v. Chrysler Corp.*, 173 F.3d 693, 701 n.7 (8th Cir. 1999).

There is enough evidence of a causal nexus between Ms. Lewis's alleged harassment and Plaintiff's race as required for the third element of a hostile work environment claim. As discussed above, the evidence indicates that it is possible Ms. Lewis harbored discriminatory animus against Plaintiff because of his race. Thus, the Court concludes that a fact-finder could infer that Ms. Lewis's more facially neutral abusive conduct toward Plaintiff resulted from racial animus.

There is no evidence, however, that any alleged harassment was based on Plaintiff's gender or national origin.

After assessing the totality of circumstances and viewing the evidence in the light most favorable to Plaintiff, the Court finds that a trier-of-fact could conclude that Ms. Lewis transformed Plaintiff's work environment into a hostile work environment, and Defendant's motion for summary judgment is denied as to that claim, based on race discrimination, in Count Four. Accordingly,

**IT IS ORDERED** that Defendant's motion for summary judgment (Doc. 61) is granted as to Count Two (Sex Discrimination) and Count Three (National Origin Discrimination). The motion for summary judgment (Doc. 61) is denied as to Count One (Race Discrimination) and Count Four (Hostile Work Environment based on race).

Dated this 21st day of March, 2023.

BY THE COURT:

Lawrence L. Piersol
United States District Judge

ATTEST:
MATTHEW W. THELEN, CLERK